UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEBRASKA

In Re:                                                 Bankruptcy No. 19-40976
                                                       Chapter 7
Jamie Nichelle Mudd,

                        Debtor.

_____/

Jamie Nichelle Mudd,

                 Plaintiff,

        vs.                                            Adversary No. 19-04048

United States of America, acting through the
United States Department of Education,

                 Defendant.

_____/

**MEMORANDUM AND ORDER**

        On October 3, 2019, Plaintiff/Debtor Jamie Nichelle Mudd filed this adversary

proceeding seeking a determination that her student loan debt owed to Defendant

United States of America, acting through the United States Department of Education

(DOE) is dischargeable under 11 U.S.C. § 523(a)(8).  DOE filed an answer on

November 6, 2019, denying that Mudd is entitled to the relief requested.

        The Court tried this case on October 21, 2020.  This adversary action is a core

proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction under 28 U.S.C.

§§ 1334 and 157, and it has authority to enter a final order in this matter.  This opinion

constitutes findings of fact and conclusions of law in accordance with Federal Rule of

Bankruptcy Procedure 7052.

1

I.      **Findings of Fact**

A.      **Education, Employment and Income**

Mudd attended college in California, where she obtained associate degrees in culinary arts and medical science.  With her associate degree in medical science, Mudd obtained employment as a certified medical assistant.[1]

Prior to moving to Nebraska, Mudd worked for Synergy Homecare as a live-in nurse, earning $13 an hour.  At Synergy, Mudd cared for geriatric patients with Alzheimer's or dementia.  Mudd lived with her patients in their homes and assisted them with dressing, cooking and cleaning.  She also administered daily medication and attended doctor visits, if needed.  Mudd's adjusted gross income in 2014 totaled $7,389.  Doc. 25.

Mudd moved to Nebraska in 2015.[2]  Upon arriving in Nebraska, Mudd obtained employment as a prep cook at a local Mexican restaurant and a deli cook at Super Saver.[3]  Mudd worked at the Mexican restaurant six days a week from 5:00 a.m. to 1:00 p.m. and earned $9.50 per hour.  At Super Saver, Mudd worked five days a week from 2:00 p.m. to 9:00 p.m. and earned approximately $10.15 per hour.  On weekends, the

---

[1] According to Mudd, a certified medical assistant escorts patients to the physician's office, takes the patients' weight, height and blood pressure, prepares equipment for the physician, performs blood draws and/or administers vaccinations.

[2] Since moving to Nebraska, Mudd has not worked as a certified medical assistant or sought employment in the health care field.  She explained that it would be necessary to take a refresher course and pass a state board exam to work as a certified medical assistant in Nebraska.  Mudd declined to pursue this certification because certain life events she has experienced make working in a health care setting too traumatic.

[3] At trial, Mudd testified she has not considered returning to employment in food service because "there is no money in that."

University of Nebraska paid Mudd $11 per hour to serve snacks at a concession stand during volleyball and football games.  She worked approximately 16 hours per week at this job.  According to her 2015 tax return, Mudd earned $16,491 in wages and $3,270 in unemployment compensation with an adjusted gross income of $19,761.  Doc. 30.

The Court received no evidence regarding Mudd's income in 2016, but from 2017 to 2019, Mudd's wages increased by nominal amounts.  Her tax returns reflect that her adjusted gross income totaled:

2017:  $22,548

2018:  $25,763

2019:  $29,189

See Docs. 57, 58, 59. [4]  On her Statement of Current Monthly Income filed in June 2019, Mudd reported an annual income of $25,848, roughly half the median family income for a household of one in Nebraska.  Doc. 60 at 42.

Mudd currently works for HKT Teleservices[5] as a customer service representative.[6]  Mudd works 40 hours per week and earns $12 per hour at this job. Since the pandemic began, Mudd works from home.  Mudd testified that, at this time, she has no opportunity for overtime at HKT.[7]

---

[4] On Schedule I, Mudd reported a gross income of $28,852.92.  Doc. 60 at 29.

[5] At trial, Mudd stated that HKT Teleservices is now called SSG.  Because both Mudd and the DOE referred to the company as HKT at trial, the Court will refer to her employer as HKT.

[6] Recently, Mudd transferred to a different division or department within HKT, where she earns a higher wage.  Although her wages were lower in her previous position, Mudd received overtime.

[7] From January 2020 to July 2020, Mudd earned less than 8 hours of overtime per pay period.  Doc. 55.

Mudd also works for FedEx Ground as a package handler.  Her responsibilities include scanning packages and loading them on trucks to be delivered.  Mudd lifts packages that weigh 75 pounds or less.  For packages over 75 pounds, Mudd must ask for assistance.  This work requires Mudd to stand continuously.  Mudd testified that she works two-and-a-half or three hours per day, six days a week at FedEx, but her time records show she averages approximately 13 hours per week.  There is no opportunity for overtime at FedEx.

Sometime before trial, Mudd sought higher-paying jobs,[8] and she testified that she will continue to search for higher-paying jobs.  In a few months, she will have three years of experience as a customer service representative.  Mudd maintains that there are additional opportunities for higher-paying positions in the customer service field for those who have three or more years of experience.  According to Mudd, she does not have the opportunity to apply for higher-paying positions at HKT.  Mudd anticipates that she will work as a customer service representative until she retires.  At the time of trial, Mudd was 50 years old.

Mudd's future employment with FedEx is limited, in part, due to the physical requirements of the job.  Although Mudd testified she will continue to work at FedEx as long as her health allows, she does not think she will possess the physical ability to

---

[8] Mudd explored the possibility of applying for higher-paying customer service representative jobs at places like Allstate and Capital One.  She testified that her coworker at HKT told her that these companies pay approximately $18-20 per hour.  Mudd has not yet applied for a position with these companies.  In March, Mudd applied for a higher-paying position with Mutual of Omaha.  Mudd claims she did not receive a job offer because of her age, education level and/or credit history.

work for FedEx until she is 75 years old.[9]  Likewise, Mudd does not believe she will be physically able to work at two jobs until she is 75 years old.  Accordingly, when asked whether she would continue to work at two jobs if she received a higher-paying customer service representative position, Mudd testified that instead of working a second job, she would put "more focus on my grandson."

### B.    Assets

Mudd owns no real estate; she lives in a one-bedroom apartment.  Mudd listed her personal property on Schedule A/B and still owns most of this household property and electronics.[10]  All of her furniture is used.[11]  Mudd listed one MB Bank account on her schedules and holds no interest in other bank accounts.  She does not have a retirement account, pension account, savings account or investments of any kind.

At the time she petitioned for bankruptcy relief, Mudd owned a 2002 Pontiac Montana with a number of mechanical issues. She traded the Pontiac and applied the $1,000 she received toward the purchase of a used 2016 Nissan Rogue.[12]  Mudd

---

[9] Mudd suffered an injury a month ago while working at FedEx, which she claims still bothers her.

[10] Mudd no longer owns the DVD player listed in her schedules, but she still has the two TVs, cell phone and record player.  Mudd's TVs are not modern.  She owns a 2003 box TV and an 18- or 19-inch flat screen TV that she purchased in 2015 for $25. Mudd's cell phone screen is damaged.

[11] Mudd obtained her couch and loveseat from her niece for $75; kitchen table and two chairs from her sister-in-law for free; end table from her brother for free; three bar stools from the side of the road; and three patio chairs from the landlord of her previous apartment.

[12] Mudd claims that, while trying to purchase a vehicle in Lancaster County (where she resides), lenders rejected her application for credit "a couple of times."  She traveled to Council Bluffs to purchase the Nissan Rogue.

financed the vehicle purchase with a five-year loan, requiring payments of $414.65 per month.  Mudd also pays $161.62 per month for vehicle insurance.  Other than the Nissan Rogue, Mudd has not acquired any additional assets not listed on her bankruptcy schedules.

### C.    Liabilities and Expenses

In November 2019, Mudd's 17-year-old grandson, who has a mild form of autism, began living with her.  Mudd's grandson is not employed, and he does not have a driver's license.  Mudd does not receive any financial assistance from either his mother or father, both of whom are unemployed.

Mudd obtained temporary guardianship of her grandson, allowing her to enroll him in school.  She has not yet applied for Social Security benefits to defray some of the expenses she is incurring to care for her grandson.  Mudd was uncertain (and the evidence did not show) whether the "temporary guardianship" granted to Mudd would allow her to apply for such benefits on his behalf.

Mudd enrolled her grandson in a Nebraska high school, where he attends both in-person and virtual classes.  Mudd's grandson, who is a junior, participates in virtual classes from Mudd's one-bedroom apartment.  Because Mudd also works from home, her grandson attends class from the bedroom while Mudd works in the living room.  Mudd testified that she has considered renting a larger apartment, but she cannot afford it.

Mudd testified that she is trying to keep her grandson focused on staying in school and completing his homework.  Due to his autism, Mudd's grandson is easily agitated.  To keep him occupied while she works, Mudd allows him to play games on his

phone, watch Netflix and use other internet services.  She testified that she is searching

for a counselor to assist her with his care.  Because of her grandson's disability, Mudd

anticipates that she will continue to care for him after he graduates from high school and

becomes an adult.

On Schedule J, Mudd listed monthly expenses totaling $2,064, just $24.44 less

than her monthly net income.  At trial, she offered evidence showing that her expenses

are higher than listed, partly due to the cost of caring for her grandson.

|  | Schedule J | Other Trial Evidence |
| --- | --- | --- |
| Rent | $510 | |
| Home maintenance repair, upkeep | $100 | |
| Electricity, heat, gas | $35 | higher due to work/school at home (no specific sum offered) |
| Cell phone, internet, cable | $189 | additional $112.51/month,[13] less cable which Mudd no longer receives |
| Food & housekeeping | $350 | additional $50/month[14] |

---

[13] To entertain her grandson, Mudd subscribes to the following services and pays average monthly expenses as follows:  Netflix ($9.64), Firecraft ($8.16), Google Playrix Games ($9.59); Roku ($10.36); Disney Plus ($7.50); Amazon Digital Services ($52.65); YouTube ($3.10) and Spotify ($11.51).  The average monthly total cost for these services is $112.51/month.  Evidence received at trial also shows that Mudd's grandson plays games on his cell phone (ranging from approximately $3.15 to $6.32 each), which she testified that she will no longer permit.

[14] Mudd testified that she spends approximately $400 per month on food since her grandson began living with her.  This includes food from local fast food restaurants, where she and her grandson dine two to three times per week.  She regularly uses coupons at these restaurants.  In 2020, Mudd received toiletries and food from local nonprofit organizations such as Salvation Army, Good Neighbor Center, Catholic Social Services and Eastern Presbyterian Church.  On cross examination, DOE directed Mudd to her deposition testimony, in which Mudd claimed that she saved $200 per month by relying on charity from local nonprofit organizations.  In its brief, DOE asserts that Mudd exaggerated when she testified that she spends $400 per month on food and

| | | |
|---|---|---|
| Childcare and children's education costs | $0 | Mudd purchases school supplies for her grandson (no specific sum offered) |
| Clothing, Laundry | $40 | additional $20/month due to grandson; Mudd rarely buys clothes for herself |
| Personal care products and services | $40 | |
| Medical and dental | $200 | Based on Mudd's testimony about her health, this expense will continue to rise. The medication costs she incurs for chronic conditions total $152/month and other related costs total $330/month.[15] Sometimes she forgoes purchasing medication she needs because it is expensive. When Mudd purchases all required medications and attends all medical appointments, she incurs $482/month in medical expenses. Subtracting the $200/month expense she estimated on Schedule J, her additional monthly medical expense totals $282/month. |
| Transportation | $250 | |
| Entertainment | $0 | $140/month for cigarettes and alcohol |

---

housekeeping supplies since her grandson began living with her because she accepts donated food.

[15] Mudd's medical conditions include: diabetes, high cholesterol, gastro reflux disease, menopause, severe allergies and a torn rotator cuff.  According to Mudd, her routine medical expenses are as follows: copay for medical visits ($30 each), blood draw ($300 per blood draw not covered by health insurance), cholesterol medication ($25 per month), diabetes ($30 per month), diabetes strips ($30-35 per month), gastro reflux medication ($30), hormone pills ($20 per month) and allergy medication ($12 per month).  Mudd does not have vision insurance; she pays for eye exams and glasses. Mudd does not have dental insurance.  Consequently, she has not sought treatment from a dentist in five years because she cannot afford this expense.  Mudd testified that she does not expect her medical condition to improve in the future.

| | | |
|---|---|---|
| Health Insurance | $250 | $60/month for health insurance premium ($190/month less than Schedule J estimate) |
| Vehicle Insurance | $100 | $61.62/month additional cost; Mudd expects this sum to decrease after a year of consistent payments |
| Car payment | -- | $414.65/month for 5 years |
| **Total** | **$2,064.00** | **$890.78 additional monthly expenses** |

Additionally, Mudd must make payments toward the following debts she accumulated after bankruptcy:

| | | |
|---|---|---|
| Tax debt | -- | Mudd owes $658 to the IRS for her 2019 income taxes. |
| Medical debt | -- | As of July 2020, Mudd owed three outstanding medical debts: $107.10, $52.43 and $2,054.05,[16] totaling $2,213.58.  Doc. 56. |

### D.    Educational Loans

Between October 2006 and May 2015, Mudd received 26 loans for sums ranging

from $660 to $48,075 to attend educational institutions: 15 to attend Heald Collage, nine

to attend San Joaquin Delta College and two Federal Family Education Loan (FFEL)

consolidated loans.  Docs. 19, 21.  To consolidate these loans, Mudd applied for and

received two loans from DOE:  one subsidized Federal Direct Loan Program (FDLP)

Consolidation Loan for $24,230.45 disbursed on May 8, 2015, at 5.875% interest per

annum and one unsubsidized FDLP Consolidation Loan of $48,075.13 disbursed on May 8,

---

[16] On cross examination, counsel for DOE suggested that Mudd's health care provider may consider forgiving her medical debt if she applied for a particular program. Mudd testified that she was unaware of this program, but she would explore the possibility.  Given the context, the Court declines to consider this exchange as evidence that Mudd will be able to reduce her medical debt.

2015, at 5.875% interest per annum.  Doc. 19, ¶ 17.

Mudd's repayment period began in May 2015.  Id., ¶ 18.  Initially, Mudd "entered into

an Income Driven Repayment plan and selected the Income Based Repayment (IBR) plan."

Id., ¶ 19.  DOE approved a $0.00 per month installment plan for a term of 12 months.  Id.  In

an IBR approval letter, DOE advised:

> • Since you are repaying under the IBR plan, you must provide your
> updated Adjusted Gross Income (AGI) and family size annually. This
> allows us to determine whether you still have a partial financial hardship
> and qualify for a payment amount that is based on your income. Your
> monthly payment amount may change based on the information you
> provide each year.
>
> • We will notify you before the date you are required to recertify your
> annual income and family size.
>
> • If we don't receive your recertification information by the deadline each
> year, your payment amount will increase. Your loan repayment terms
> letter details your payment amount followed by the payment amount that
> will go into effect if you do not recertify. If you no longer have a partial
> financial hardship in future years or do not recertify by the deadline,
> unpaid interest may capitalize (increase the principal balance of your
> loan).

Doc. 24.

Mudd made 12 "qualified monthly payments" from May 2015 to April 2016,

totaling $0.00.  Doc. 19, ¶ 21.  Mudd failed to recertify in 2016 as required by her

Income Based Repayment Plan. [17]  Id., ¶ 22.  Consequently, DOE FedLoan advised her

that her installment payments reverted to IBR-Permanent Standard, $796.87 per month

---

[17] At trial, Mudd explained that she did not recertify immediately because she
was dealing with personal issues and saving money to move to a more affordable
apartment.  Later she attempted to recertify by using a computer at the local library but
found the process too difficult.  She contacted a DOE agent for assistance, who
reportedly informed her that he could not help and she had to "figure that out."  As a
result of these difficulties, Mudd requested a paper application.  When she received the
application in the mail, she completed it and mailed it back.

beginning May 24, 2016.  Id., ¶ 23.  Mudd did not pay the May 2016 installment payment or any IBR-Permanent Standard $796.87 payments, and her consolidated loans "fell into delinquency."  Id.

In February 2017, Mudd applied for an Income Driven Repayment plan requesting a lower monthly payment.  Docs. 19, 30.  To change her prior Income Driven Repayment plan election of IBR to an alternate plan, DOE required that Mudd make a single month's payment under the standard plan or request a "reduced-payment forbearance" with a payment of at least $5.  Mudd did not fulfill this requirement until May 2018.  Docs. 19, 31.  "On May 3, 2018, Mudd re-applied for an Income Driven Repayment plan requesting the lowest payment along with the $5.00 reduced payment forbearance."  Doc. 19, ¶ 28; see also Doc. 32.  DOE approved Mudd's application for Revised Pay as You Earn (REPAYE) plan of $0.00 per month for 12 months, beginning June 24, 2018.  Docs. 19, 33.  Mudd made 12 "qualified monthly payments" toward her loans, from June 2018 to May 2019, totaling $0.00.  Doc. 19, ¶ 30.  According to DOE, Mudd made a total of 24 qualifying payments toward the 240 required to qualify for student loan forgiveness.[18]  Id., ¶ 31.

In February 2019, DOE FedLoan sent Mudd a recertification letter, advising that the recertification must be received by 04/27/2019.  Docs. 19, 34.  Mudd failed to recertify.  Doc. 19, ¶ 32.  Consequently, DOE reverted her payment to the REPAYE - Permanent Standard with a new monthly payment of $963.38.  Docs. 19, 35.  Mudd did not make any of the $963.38 payments.  Doc. 82 at 3.

---

[18] Mudd may be eligible for additional qualified monthly payments as provided by the CARES Act.  Doc. 19, ¶ 31.

### E.     Bankruptcy

According to Mudd, multiple medical bills and a wage garnishment[19] led to her decision to petition for bankruptcy relief.  She filed her petition under Chapter 7 of the Bankruptcy Code on June 4, 2019.  Mudd testified the information in her schedules was accurate at the time she filed for bankruptcy, but she has incurred additional expenses as outlined above.  According to Mudd, none of the debts listed in Mudd's schedules are from credit cards or personal loans.[20]

"On September 25, 2019 Education received notice of Notice of Discharge for Bankruptcy #19-40976, advising student loans are non-dischargeable. Mudd's bankruptcy holds were removed, and the account was returned to normal servicing."  Doc. 19, ¶ 33.  As of October 23, 2019, the outstanding balance of Mudd's consolidated loans with DOE totaled $89,525.38, with a daily interest accrual of $14.31.

After she petitioned for bankruptcy relief, Mudd reviewed DOE repayment plans, some of which include a $0.00 to $126 monthly payment.[21]  Doc. 19.  According to

---

[19] Mudd purchased a washer and dryer but could not afford to make all the payments on time.  According to Mudd, the seller filed a garnishment and obtained "triple times the amount" she agreed to pay for the washer/dryer system.

[20] Schedule F shows that $86,997 of the $107,675.78 in unsecured debt is student loan debt.  Of the $20,678.78 in other nonpriority unsecured debt, $13,232.42 is related to medical care.

[21] DOE provided a chart of estimated amount due under the REPAYE plan for varying income and family sizes.  See Doc. 19 at 9-10.  For a family size of one with an income of $28,000, the payment is $74.  Id.  For a family size of one with an income of $30,000, the payment is $91.  Id.

Based on Mudd's adjusted gross income of $29,189.00 from her 2019 federal tax return and a family size of one, Mudd's estimated monthly student loan payment under Income Based Repayment Plan for the first 12 months would be $125.61 using the following formula: (($29,189.00 - $19,140.00)*.15)/12. Doc. 19.

Mudd, she received this information in the mail about a week before trial.  Mudd testified

that at the time she was applying to have the "loan deferred or whatever, nobody spoke

to me about half of those things that the [DOE's witness] spoke about today. I didn't

know about [any] of that."  Although Mudd is now aware that her student loans may

ultimately be forgiven under some DOE repayment plans, she testified that she still has

concerns about meeting her loan obligations.  Mudd maintains her student loan debt

has affected her ability to move, qualify for loans and obtain employment.

In response to the suggestion that DOE's credit reporting may have affected

Mudd's ability to qualify for credit or obtain employment, DOE's representative

explained:

> FedLoan begun credit reporting in July of 2015. See Exhibit A (Direct Consolidation Promissory Note) Her loans were reported current from July 2015 through July 2016, after such time the borrower became delinquent. Mudd had delinquent reporting from August 2016 through December 2016, before entering a forbearance to cure her delinquency. Mudd's credit reporting has been reported as current from January 2017 through the present. As long Jaime Mudd remains current in a repayment plan, even if the required monthly payment amount is $0.00 or is otherwise in a forbearance, no adverse reporting will be made to a credit reporting agency.

Doc. 19, ¶ 25.

## II.   Conclusions of Law

### A.      Student Loan Dischargeability Standards

Section 523(a)(8) of the Bankruptcy Code provides that debts arising from certain

educational loans or benefits may not be discharged unless "excepting such debt from

discharge . . . would impose an undue hardship on the debtor and the debtor's

dependents."  11 U.S.C. § 523(a)(8).  Unlike many other debts, a debtor's obligation to

pay a student loan debt remains until there has been an express determination that the

loan is dischargeable.  Conway v. Nat'l Collegiate Tr. (In re Conway), 495 B.R. 416, 419

(B.A.P. 8th Cir. 2013).  In other words, the exception from discharge under section

523(a)(8) is self-executing in that the discharge order will not include a student loan

debt unless a debtor affirmatively secures a hardship determination.  Id.; see also Wells

v. U.S. Dep't of Educ. (In re Wells), 2020 WL 907800, at *3 (Bankr. D. Neb. Feb. 25,

2020).

     The debtor bears the burden of establishing undue hardship by a preponderance

of the evidence.  Kemp v. U.S. Dep't of Educ. (In re Kemp), 588 B.R. 226, 230 (B.A.P.

8th Cir. 2018); Walker v. Sallie Mae Servicing Corp. (In re Walker), 650 F.3d 1227, 1230

(8th Cir. 2011).  "The burden is rigorous. 'Simply put, if the debtor's reasonable future

financial resources will sufficiently cover payment of the student loan debt - while still

allowing for a minimal standard of living - then the debt should not be discharged.'"

Educ. Credit Mgmt. Corp. v. Jesperson, 571 F.3d 775, 779 (8th Cir. 2009) (quoting Long

v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554-55 (8th Cir. 2003)).  In

analyzing the debtor's undue hardship claim, the Court examines the unique facts and

circumstances of the particular bankruptcy case.  Id.; Swafford v. King (In re Swafford),

604 B.R. 46, 49 (Bankr. N.D. Iowa 2019) (citing In re Long, 322 F.3d at 554).  More

specifically, in assessing whether a debtor has met his or her burden of proving undue

hardship, courts in the Eighth Circuit apply a totality-of-circumstances test, under which

they consider: "(1) the debtor's past, present, and reasonably reliable future financial

resources; (2) a calculation of the reasonable living expenses of the debtor and her

dependents; and (3) any other relevant facts and circumstances surrounding the

particular bankruptcy case." In re Walker, 650 F.3d at 1230 (citing In re Long, 322 F.3d at 554); In re Kemp, 588 B.R. at 230-31; In re Wells, 2020 WL 907800, at *4.

B.    **Analysis**

1.    **Debtor's past, present and reasonably reliable future financial resources**

The evidence the Court received regarding Mudd's work history reveals that she has never earned more than $13 per hour, unless she received overtime or holiday pay. In the past five years (2015-2020), Mudd earned between $9.50 per hour and $13 per hour in food service and customer service jobs.  During most or all of this five-year period, Mudd held more than one job to meet her basic needs.

From 2014 to 2019, Mudd's adjusted gross income increased from $7,389 in 2014 to $29,169 in 2019.  DOE highlights this achievement and commends Mudd for "her resilience and perseverance in being able to switch fields of employment to increase her income and meet her employment interests and needs."  Doc. 99 at 8. DOE also emphasizes Mudd's claim that after three years of customer service experience, she will be eligible to apply for jobs with banks and insurance companies that pay $18 to $20 per hour.

The Court agrees Mudd should be commended for her resilience and perseverance, but it does not agree that the evidence shows the optimism DOE suggests.  While Mudd's earnings increased between 2014 and 2019, an increase from poverty level wages to an income that equates to roughly half of the median income for

a household of one in Nebraska[22] does not suggest earning capacity that may materially affect her financial situation.

Mudd's expectations that she will obtain a higher-paying job in the customer service field is likewise suspect. Mudd testified that she explored and will continue to explore the possibility of applying for higher-paying customer service representative jobs at Allstate and Capital One, which her coworker told her pay $18 to $20 and for which she claims she is qualified. The Court received this hearsay evidence without objection but finds its credibility suspect for a number of reasons.[23] The Court received no evidence that these positions are routinely available or that Mudd meets the qualifications of such positions. To the contrary, the evidence shows Mudd applied for a higher-paying position with Mutual of Omaha, which refused to extend a job offer because of her age, education and/or credit history. According to Mudd, she does not have the opportunity to apply for higher paying positions at HKT. Despite the uncertain earning potential, Mudd anticipates that she will work as a customer service representative until she retires.

Even if Mudd obtained a higher-paying customer service representative position, there is no assurance that Mudd's income would significantly improve. Mudd's future employment with FedEx is limited, in part, due to the physical requirements of the job.

---

[22] See Doc. 60 at 42. On the date she filed her petition, the median family income in Nebraska for a household of one totaled $50,061. Mudd reported an annual income of $25,848 on her Statement of Current Monthly Income. Id.

[23] See Conway v. Nat'l Collegiate Tr. (In re Conway), 495 B.R. 416, 422 (B.A.P. 8th Cir. 2013) ("While Ms. Conway may have the 'possibility' of earning a higher income in the future, there is no evidence to support that possibility. We will not substitute assumptions or speculation for reasonably reliable facts." (internal citation omitted)).

16

Although Mudd testified she will continue to work at FedEx as long as her health allows, she does not think she will possess the physical ability to work for FedEx until she is 75 years old.  Likewise, Mudd does not believe she will be physically able to work at two jobs until she is 75 years old.  Accordingly, when asked about whether she would continue to work at two jobs if she received a higher-paying customer service representative position, Mudd testified that instead of working a second job, she would put "more focus on my grandson."

At trial, DOE insinuated that Mudd must maintain two jobs to meet her burden of showing undue hardship.  It asserted that, even if Mudd obtains a higher-paying customer service representative position where she "only" worked 40 hours per week, she "would still have the ability in terms of time in your schedule and otherwise to work a second job."  To meet her burden of showing that her student loans impose an undue hardship, the Bankruptcy Code does not require Mudd to commit to working over 50 hours at two jobs (one of which requires her to lift up to 75 pounds and to stand for long periods of time) to earn sufficient income to pay her student debt.  See Neal v. N.H. Higher Educ. (In re Neal), 354 B.R. 583, 589 (Bankr. D.N.H. 2006) ("While she has worked as many as seventy-five hours per week in the past, the Court will not require, and the Code does not require, that a debtor, in order to establish undue hardship, prove that even after working seventy-five hours a week she is unable to pay her student loans. Absent truly exceptional circumstances, though, a debtor must work full-time, or forty hours a week.").

Accordingly, the Court finds that it is unlikely Mudd's current income will increase significantly, but it may decrease if she does not find a higher-paying job and her health interferes with her ability to meet the physical requirements of the FedEx position.

### 2.    Reasonable and necessary living expenses

In analyzing the second prong of the totality-of-circumstances test, the Court considers Mudd's reasonable and necessary living expenses to determine whether she can afford payments on her student loans and maintain a minimal standard of living.  In re Walker, 650 F.3d at 1234.  "A debtor is entitled to 'sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment' to maintain a minimal standard of living."  Piccinino v. U.S. Dep't of Educ. (In re Piccinino), 577 B.R. 560, 565 (B.A.P. 8th Cir. 2017) (quoting Nielsen v. ACS, Inc. (In re Nielsen), 473 B.R. 755, 760 (B.A.P. 8th Cir. 2012)); see also Clavell v. U.S. Dep't of Educ. (In re Clavell), 611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) (applying the stricter Brunner test, "minimal standard of living" does not require that the debtor live in poverty). For an expense to be reasonable and necessary, it must be "modest and commensurate with the debtor's resources."  In re Conway, 495 B.R. at 422 (quoting Jesperson, 571 F.3d at 780).  "[A] court may not engage in speculation when determining net income and reasonable and necessary living expenses."  Jesperson, 571 F.3d at 780.

On Schedule J, which Mudd filed on June 4, 2019, Mudd recorded a monthly net disposable income of $24.44.  Since then, her expenses significantly increased.  For the next five years she is obligated to pay $414.65 toward a car payment. She also spends an additional $61.62 for vehicle insurance, which may decrease.  Her medical expenses are higher than budgeted, and she anticipates that her health care costs will continue to

rise due to her high cholesterol and diabetes.  Additionally, Mudd is spending not less

than an additional $70 per month to care for her grandson.  In order to make ends meet,

she sought food and toiletries from local nonprofit organizations such as the Salvation

Army, Good Neighbor Center, Catholic Social Services and Eastern Presbyterian

Church.[24]  Mudd rarely buys new clothes for herself, she lives in a one-bedroom

apartment and all of her furniture and electronics are used.  The evidence reflects that

her standard of living is minimal.

DOE argues that, when it became necessary to replace her vehicle, she did not

purchase the cheapest model available and/or seek a loan with a lower monthly

payment.  At trial, Mudd explained that it was necessary to replace her 2002 Pontiac

Montana due to mechanical issues.  When shopping for a different vehicle, Mudd

testified she ran into a myriad of issues stemming from her credit, forcing her to travel to

a different county to purchase a vehicle.  She claimed that a salesman proposed that

she purchase a 2016 Nissan Rogue because it was "a good deal," and the dealership

reduced the price by $1,000 in exchange for her Pontiac.  She accepted the proposal

without hesitation.  While it is true that Mudd did not extensively shop for a new vehicle

and there is no evidence that she attempted to negotiate a lower payment, the Court

rejects DOE's argument that this conduct shows her lack of good faith.  Mudd

---

[24] On cross examination, DOE directed Mudd to her deposition testimony in
which Mudd claimed that she saved $200 per month by relying on charity from local
nonprofit organizations.  In its brief, DOE asserts that Mudd exaggerated when she
testified that she spends $400 per month on food and housekeeping supplies since her
grandson began living with her because she accepts donated food.  While Mudd's
testimony is inconsistent, the Court finds that $400 per month on food for two people
(with or without the use of charitable food and supplies) is neither frivolous nor
unreasonable.

purchased a <u>used</u> vehicle that meets her needs.  A Nissan Rogue is not a luxury vehicle, and the purchase of a newer, more reliable vehicle to drive to work at FedEx and transport her grandson to school is most certainly not frivolous.  Although a car payment strains her budget, a payment of $414.65 is consistent with a minimal standard of living given her credit history and personal needs.

DOE also argues that Mudd offered no receipts showing her prescription expenses, no pharmacy records and no medical reports corroborating her medical expense claim.  Schedule F shows Mudd discharged $13,232.42 in debt related to health care (64% of the unsecured debt that did not arise from student loans) and the Court received evidence that Mudd incurred over $2,200.00 in medical debt since she filed her bankruptcy petition and schedules.  This is corroborating evidence.  Further, the Court finds Mudd's testimony regarding her medical conditions and medical expenses credible.  There is no evidence suggesting otherwise.

Next, DOE argues some of Mudd's expenses are unreasonable and excessive.  Specifically, it argues that the $112.51 per month in Spotify, Netflix, Disney Plus, Roku, Amazon Digital Services and Google Firecraft charges are unnecessary and excessive.  It cited cases where courts found that expenses like these did not reflect sufficient "belt tightening."  DOE also argues that $100 per month for cigarettes is not a necessary expense, and the money she spends on them is sufficient to cover her current REPAYE obligation.

At trial, Mudd explained her grandson participates in virtual classes from Mudd's one-bedroom apartment, the same place where Mudd is currently working.  Due to his autism, Mudd's grandson is easily agitated.  To keep him occupied while she works,

Mudd allows him to play games on his phone, watch Netflix, and enjoy the other services listed above.  Mudd testified that she was surprised to see so many charges for games and indicated that she would no longer permit these charges.  She also eliminated cable from her budget.

Given her recent vehicle purchase and the increase in her medical expenses, Mudd will have no choice but to reduce or completely eliminate these video and music subscriptions, cell phone games and cigarette expenses to meet her monthly budget. Although courts routinely find that limited funds spent on recreation expenses is consistent with a minimal standard of living,[25] it appears that her current budget will not allow them.  Schedule J together with the evidence received a trial show that Mudd's monthly expenses exceed the monthly income she reported on Schedule I[26] by more than $800 per month.  These expenses do not include the medical and tax debts she incurred since filing her petition and schedules.  Subtracting $112.51 in video and game subscriptions and $100 in cigarette expense will not eliminate the monthly deficit.

---

[25] See Clavell v. U.S. Dep't of Educ. (In re Clavell), 611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) (explaining one component of a minimum standard of living is that "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet."); Vargas v. Educ. Credit. Mgmt. Corp. (In re Vargas), 2010 WL 5395142, at *3 (C.D. Ill. Dec. 22, 2010) (noting that debtor "allocates approximately $90.00 per month to smoking and the purchase of lottery tickets as recreation and an additional $44.00 per month for expanded cable. Even under the minimal standard of living test, '[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.'" (internal citation omitted)).

[26] On Schedule I, Mudd reported a gross income of $28,852.92, only $334 less than the adjusted gross income of $29,289 she reported on her 2019 tax return.  Doc. 60 at 29.

Considering the totality of circumstances, all other expenses listed on Scheduled J and

supplemented at trial are reasonable and necessary.[27]

### 3.    Other relevant facts and circumstances

The third prong of the totality-of-the-circumstances test requires the Court to

consider all other relevant facts or circumstances surrounding the bankruptcy case.

Bankruptcy courts in the Eighth Circuit have considered a number of factors in

analyzing the third prong of the totality-of-circumstances inquiry, including:

> (1) total present and future incapacity to pay debts for reasons not within
> the control of the debtor; (2) whether the debtor has made a good faith effort
> to negotiate a deferment or forbearance of payment; (3) whether the
> hardship will be long-term; (4) whether the debtor has made payments on
> the student loan; (5) whether there is permanent or long-term disability of
> the debtor; (6) the ability of the debtor to obtain gainful employment in the
> area of the study; (7) whether the debtor has made a good faith effort to
> maximize income and minimize expenses; (8) whether the dominant
> purpose of the bankruptcy petition was to discharge the student loan; and
> (9) the ratio of student loan debt to total indebtedness.

---

[27] See Kloos v. U.S. Dep't of Educ. (In re Kloos), 2010 WL 3089722, at *1 (Bankr. D. Neb. Aug. 5, 2010) ("It is not necessary to make a detailed finding of fact concerning the actual current and future monthly expenses of the debtor and her husband. Whatever their monthly expenses are, the unrebutted testimony by the debtor is that, on a monthly basis, the debtor and her husband come up short. They rely on charity, including a gift of at least $100 a month from their church, regular aid from Eastern Nebraska Community Action, and upon a food pantry for food handouts, including one during the week of trial. I find as a fact that the monthly expenses exceed the monthly income. . . . Nobody whose monthly expenses exceed monthly income by several hundred dollars is, or wants to be, relying upon charity from the church, from governmental entities, or from food pantries."); see also In re Clavell, 611 B.R. at 517 (finding even under the stricter Brunner standard that a debtor is not required to "forego necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment that is incident to modern life." . . . "One must remember, after all, that the point at which a debtor experiences 'undue hardship' – not abject privation – is the point at which a discharge is supposed to be available under the statute." (citations omitted)).

In re Piccinino, 577 B.R. at 566.  "These numerous factors do not provide an exclusive list of items that courts may consider and also do not require a court to address each and every one in a particular case." Id.  "These are mere factors for a court to consider, and a court need not address each and every one of them, particularly where there is no evidence, one way or the other, concerning a factor." Hurst v. S. Ark. Univ. (In re Hurst), 553 B.R. 133, 138 (B.A.P. 8th Cir. 2016).  "The purpose of this final inquiry allows a court to consider any other relevant information that would be persuasive to overcome the income and expense analysis of undue hardship under the first two factors of the totality of the circumstances test." Fern v. FedLoan Servicing (In re Fern), 563 B.R. 1, 4-5 (B.A.P. 8th Cir. 2017).

The expenses related to Mudd's care for her grandson affect her ability to repay her student loans and other debts.  The evidence shows that she incurs additional expenses of not less than $70 to feed him and clean his clothes.  She also buys him clothes and school supplies, expenses which she failed to itemize at trial.  Additionally, she is exploring counseling services for him that will add to these costs.  Due to his disability, Mudd anticipates that she will continue to care for her grandson after he graduates from high school and becomes an adult.  Her burden of caring for his unique needs weigh in favor of discharge. See In re Walker, 406 B.R. at 859 ("[T]he Eighth Circuit's 'totality' approach expressly requires the unique circumstances and needs of the debtor and the debtor's dependents to be considered. This includes any circumstances arising from individual household members' medical or psychological conditions.").

DOE claims it is not challenging the extra expenses Mudd is incurring by voluntarily caring for her grandson, yet points to a case in which the court observed that providing "$100.00 in support for a grandchild although she has no legal obligation to do so" could be considered an unreasonable expense.  Doc. 99 at 19 (citing Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth), 347 B.R. 652, 659 (B.A.P. 8th Cir. 2006)). The difficulty with this inferred argument is that DOE is inviting this Court to make a judgment concerning Mudd's family arrangement rather than her lifestyle choices, such as spending money on video streaming or cigarettes.  Like the bankruptcy court in In re Mitchem, the Court finds it entirely inappropriate to find or suggest that Mudd should not care for her grandson or to weigh undue burden factors against her for doing so.[28]

---

[28]  The bankruptcy court in In re Mitcham observed:

[I]f the Court were to accept the Creditor's argument, the question then arises whether the holding should be limited to only the facts presented in this case—i.e., only grandmothers who take legal custody of their grandchildren after incurring a student loan. Or instead, does the Court eventually expand its ruling so as to exclude from an "undue hardship" analysis, all the expenses of family members who were not in existence at the time the student loan debt was incurred. For example, could a debtor (regardless of age) adopt a child after a student loan debt is incurred and still factor in that child's expenses for purposes of an "undue hardship" analysis. Going even further, how would the expenses of an ill spouse be treated if the debtor, after obtaining his or her student loan obligation, knew that the spouse may become ill after their marriage?

Additional concerns are also raised by the Creditor's position. First, the language of § 523(a)(8) provides that an "undue hardship" determination is made by reference to both "the debtor and the debtor's dependents[.]" Thus, contrary to the Creditor's position, no mention is made in the statute that the debtor's dependent(s) be in existence at the time the student loan debt was incurred.[3] Second, it is a fundamental principle of law that, in the absence of an overriding public concern, courts are to stay out of matters involving familial relations such as who a person may marry and how many children a person should have. See generally Seal v. Morgan, 229 F.3d 567, 575

Mitcham v. U.S. Dep't of Educ. (In re Mitcham), 293 B.R. 138, 146-47 (Bankr. N.D. Ohio 2003); see also Williams v. Mo. S. State Coll. (In re Williams), 233 B.R. 423, 429 (Bankr. W.D. Mo. 1999) ("The only circumstance that would seem to set them apart from many other struggling families is the responsibility they have assumed as guardians for a 17-year-old handicapped girl who was literally abandoned on their doorstep by the natural mother. The Debtors are to be commended—not penalized—for their willingness to care for this abandoned child, particularly in view of the stringent financial circumstances under which they are living."); Junghans v. William D. Ford Fed. Direct Loan Program U.S. Dep't of Educ. (In re Junghans), 2003 WL 23807971, at *7 (Bankr. D. Kan. May 13, 2003) ("The Court does not condemn her decision, under all of these circumstances, to continue financially supporting her children and grandchild, and declines to condemn them to an even more spartan existence than they already endure.").

DOE also observes that "questions remain" regarding whether Mudd will receive "Social Security, SSI payments on behalf of her grandson to help defray the additional expenses she has voluntarily incurred by bringing him into her home." Doc. 99 at 9. It claims that she has not met her burden of showing "why she could not qualify as the

---

(6th Cir. 2000) (fundamental rights include the right to marry, to have children, to direct the education and upbringing of one's children, and marital privacy).

Thus, for all of the above reasons, the Court finds it improper to make a judgment call concerning those decisions the Debtor made with respect to her family arrangement.

Mitcham v. U.S. Dep't of Educ. (In re Mitcham), 293 B.R. 138, 147 (Bankr. N.D. Ohio 2003).

representative payee on his behalf."  Id.  The Court received no evidence regarding whether Mudd would be eligible to receive such benefits or how much money she would receive.  The Court declines to engage in speculation regarding the availability of this potential benefit.  See Jesperson, 571 F.3d at 780 ("[A] court may not engage in speculation when determining net income and reasonable and necessary living expenses."); In re Conway, 495 B.R. at 422 ("While Ms. Conway may have the 'possibility' of earning a higher income in the future, there is no evidence to support that possibility. We will not substitute assumptions or speculation for reasonably reliable facts." (internal citation omitted)).

In its post-trial brief, DOE repeatedly highlighted Mudd's statements that it maintains show a lack of credibility.  It also emphasized the numerous student loan repayment options available to Mudd, claiming that they do not impose an undue hardship on Mudd.

Since she consolidated her student loans through a DOE program, Mudd has made little or no effort to repay her debt.[29]  Although DOE offered a variety of repayment options, Mudd sporadically complied with DOE's requests for the information necessary to qualify for these flexible programs.  On those occasions when she completed the necessary paperwork, DOE responded with forbearance or a $0.00 per month repayment plan.

---

[29] Mudd's student loan debt comprises 81% of her unsecured debt.  While it is possible she considered this debt when she petitioned for bankruptcy relief, she testified that a wage garnishment and multiple medical bills prompted her to file.  See Doc. 60 at 25.

The availability of a repayment plan is a factor the Court can consider when evaluating whether undue hardship exists.  In re Piccinino, 577 B.R. at 566.  "While the debtor's eligibility for an income-based repayment program is not dispositive, it is a factor that weighs against the discharge of the debt."  In re Kemp, 588 B.R. at 231.  "Although some question remains as to the weight to be given to the ability to make an ICRP payment following Jesperson, the Eighth Circuit made clear that the ability to do so is, at a minimum, an important factor in the analysis."  Sederlund v. Educ. Credit Mgmt. Copr. (In re Sederlund), 440 B.R. 168, 175 (B.A.P. 8th Cir. 2010).  While the availability of repayment options is a relevant fact, it cannot be the only basis to consider in determining undue hardship.  In re Fern, 563 B.R. at 5.

DOE's repayment options weigh against discharging Mudd's student loan debt, but other facts and circumstances weigh in favor of granting this relief.  While Mudd's testimony regarding tax refunds, banking transactions and the availability of higher paying jobs is suspect, the Court finds the evidence she offered regarding her health conditions, health care expenses and other expenses credible.

Mudd has made a good faith effort to maximize her income.  Mudd works approximately 53 hours per week at two jobs.  Her employment history suggests she is willing to work overtime, although neither of her jobs currently allow this opportunity. Mudd's ability to obtain a new customer service job paying significantly more than what she earns now is uncertain.  Even if she finds a higher-paying position, she is unlikely to continue to work at FedEx due to her health conditions and her grandson's needs. Overall, Mudd's expenses are necessary and reasonable and consistent with a minimal standard of living.  Currently, her expenses significantly exceed her income on a

27

monthly basis.  She has no savings, owns no assets of significant value (except her used car in which she holds no equity), lives in a one-bedroom apartment and obtains food and toiletries from local nonprofit organizations to make ends meet.  Her medical expenses are higher than budgeted, and she anticipates that her health care costs will continue to rise due to her high cholesterol and diabetes.  At the time of trial and for the foreseeable future, Mudd does not have sufficient disposable income to pay her student loan debt.  It imposes an undue hardship on her and her dependent.

## III.    Conclusion

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss. For the reasons stated above, the Court finds that Mudd's loans are an undue hardship on her and her dependent grandson.  Accordingly, Mudd's consolidated student loans are discharged under 11 U.S.C. § 523(a)(8).

Dated:  December 9, 2020.


SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT